UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
MOHAMMED DONZO,

                                                  **FIRST AMENDED COMPLAINT**
                    Plaintiff,                        21-CV-00629 (LGS)

        -against-

THE CITY OF NEW YORK, JAMES P. O'NEILL, Former     **JURY TRIAL**
NYPD Commissioner, DERMOT P. SHEA, Police Commissioner  **DEMANDED**
SGT. ALLISON MULLEN in her official and Individual capacity,

                Defendants.
-----------------------------------------------------------------------x

Plaintiff MOHAMMED DONZO, by is attorneys, DAVIS, NDANUSA, IKHLAS & SALEEM LLP, as and for his complaint against Defendants, respectfully allege as follows.

## NATURE OF THE ACTION

1. Plaintiff brings this action against the City of New York and several individual defendants for declaratory relief and damages to secure protection of and to address deprivation of rights secured under, *inter alia*, the United States Constitution, New York State Constitution Article 1, §11, New York State Executive Law §296 (New York State Human Rights Law), New York City Administrative Code §8-107 providing for relief against discrimination in employment or by a government actor. This action additionally seeks relief pursuant to 42 U.S.C. §§1981, 1983 and 1988.

## PARTIES

2. At all times hereinafter mentioned, plaintiff, **MOHAMMED DONZO**, and African-American male, was and is a resident of the County of Suffolk, and State of New York.

3. Plaintiff is a "person" within the meaning of Executive Law § 292(1), and within the meaning of New York City Administrative Code § 8-102(1).

4. At all times hereinafter mentioned, defendant, **CITY OF NEW YORK** (hereinafter "CITY"), was and still is a municipal corporation duly organized and existing by virtue of the laws of the State of New York.

5. At all relevant times herein, Plaintiff was employed by Defendant City in the NYPD.

6. Defendant the City of New York (the "City") is a municipal corporation existing by virtue of the laws of the State of New York. The City, through the NYPD, maintains a policy and practice of discriminating against African-Americans in the Narcotics Bureau. The City is liable for the discrimination Plaintiff suffered.

7. Defendant James P. O'Neil was the Police Commissioner for the City of New York from September 2016 through November 2019 and approved the final order of dismissal that resulted in Plaintiff's termination.

8. Defendant Dermot Shea is the present Police Commissioner of the City of New York, taking office in December of 2019.

9. Defendant Sergeant Allisson Mullen was at all relevant times herein an officer with the New York City Police Department.

## JURISDICTION AND VENUE

10. This is a civil rights action seeking damages for the Defendants' violations of Plaintiff's rights, privileges, and immunities under the United States Constitution, as amended, and the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 1988, Article 1 Section 11 of the New York Constitution.  Plaintiff further invokes the pendent jurisdiction of this Court in accordance with 28 U.S.C. §§ 1331, 1343(a)(3) & (4), and 1367 (a).  As the unlawful acts complained of herein occurred in the Borough of Manhattan, County of New York, City and State of New York which is within the Southern District of New York, venue is proper within this District pursuant

to 28 U.S.C. § 1391(b) and (c).

11. Jurisdiction of this Court is proper under 42 U.S.C. § 1983, 1988 and 28 U.S.C. § 1343(3), 28 U.S.C. § 1331 and 28 U.S.C. §200oe through 2000e(15).

## PRELIMINARY STATEMENT

12. On or about March 2, 2016, Plaintiff Mohammed Donzo, a then officer with the NYPD, received a notice to appears for a GO-15 interview in connection with an incident that happened nearly a year prior on March 1, 2015. The incident, described below if greater detail, is what precipitated Donzo's firing from the police department.

13. When Donzo appeared at the hearing he was met by Defendant Mullen and Lt. Christopher. Christopher called Donzo Ahmed and when Donzo corrected Christopher, Christopher responded, "I don't give a shit what your name is."

14. During the interview, Donzo was asked a series of questions in the presence of his appointed delegate.

15. During recess, the delegate exited the room to use the bathroom at which point, Mullen says to Donzo, "niggers like you don't belong on this job, and I will make sure you are fired from this job."

16. Donzo was so shocked by the brazen act that he did not dare to share it with anyone for fear of retaliation. He believed that the claims against him, connected to the events of March 1, 2005, would eventually be resolved as he was never present at the incident.

17. However, as explained below, Mullen was driven by the same racial animus she expressed at the GO-15 hearing and ensured that Donzo was eventually fired from this position as an officer with the NYPD.

18. This drive influenced the manner in which Mullen "cherry picked" evidence that

she pursued all throughout the underlying investigation.

19. This action seeks to vindicate the rights of the Plaintiff who was wrongfully terminated and whose promotion were denied or delayed based on his race.

20. This is an action brought for substantial compensatory damages and reasonable counsel fees premised upon the Defendants' continuing acts of unlawful discrimination and wrongful termination, based on Plaintiff's race, for his marginalization, and the unlawful denial to Plaintiff of promotion and benefits to which he is entitled, unlawful employment discrimination, in violation of the Executive Law of the State of New York, New York State Human Rights Law ("Executive Law"), § 296 et seq; the Administrative code of the city of New York, New York City Human Rights Law ("Administrative code") § 8-101, et seq.

## FACTUAL ALLEGATIONS

21. Mohammed Donzo was an employee of the NYPD from July 6, 2010 to March 1, 2018 when Assistant Deputy Commissioner of Trials, David S. Weisel, recommended that Donzo be "dismissed from employment with the [NYPD]."

22. On March 15, 2018, Mr. Weisel's recommendation was ratified and approved by the then commissioner of the NYPD, defendant James P. O'Neill.

23. Prior to March 1, 2018, Donzo's rank was police officer, Male (POM)

24. Donzo identifies as a Black male with national origin from Liberia.

25. That on or about November 14, 2014, Donzo as a POM was placed on Investigate Track Assignment and due for a promotion to detective in or about March 2016.

26. That Donzo's promotion to detective was abruptly stayed just days before said promotion, due to an investigation into an incident that occurred nearly a year prior.

27. That the investigation that led to Donzo's firing was precipitated by the event of

March 1, 2015 ("The Incident").

28. That on March 1, 2015 Alhaji Donzo ("A. Donzo"), a non-party and the brother of Plaintiff Donzo, presented at a car repair shop located at 127-32 Willets Point Boulevard, Queens, NY 11368.

29. That A. Donzo got into a dispute with the owners of the repair shop over the cost of the repairs and the quality thereof.

30. That Plaintiff was not present at the time of the incident nor at the location of the incident.

31. That nearly a year afterThe Incident, the NYPD, by Sergeant Allison B. Mullen, investigated an allegation that Donzo was present at the event and that Donzo, while off-duty, *inter alia*, unlawfully displayed his Departmental Identification and firearm, and seized civilian property without permission or authority.

32. That the NYPD's investigation of the event was conducted in such a manner that Plaintiff was not provided a fair investigation by Sergeant Mullen due to Mullen's conduct being rooted in racial discrimination in violation of The Civil Rights Act of 1871, 42 U.S.C. § 1983.

33. That the failure to properly investigate was motivated by Mullen racial animus against Black officers generally and Donzo specifically.

34. That through the course of the investigation the NYPD did not conduct a thorough investigation and instead targeted Plaintiff leaving him no opportunity to be provided a fair hearing before NYPD Agent, Commissioner David S. Wiesel.

35. That the NYPD, through Mullen, acted with racial animus when it failed to properly investigate the incident that occurred on March 1, 2015, where a witness claimed Plaintiff was not present at the incident site but instead the person that was present was someone named Mamadou

Dioubate ("Dioubate").

36. That but for Mullen's racial animus the investigation would have been properly conducted and Donzo exonerated.

37. That despite Dioubate's presence at the incident, NYPD failed to properly investigate Mamadou Dioubate's possible involvement with the incident on March 1, 2015.

38. That racial discrimination against Donzo informed Mullen's failure to investigate the possibility that Dioubate, and not Donzo, was the person that allegedly threatened the repair shop owners.

**39.** That the NYPD failed to properly investigate Mr. Dioubate's involvement in the incident in question when NYPD did not take a complete statement from Mr. Dioubate or properly pursue Mr. Dioubate for further information.

40. That the NYPD did not further seek out Mr. Dioubate even after learning from Alhaji Donzo that Mr. Dioubate was present at the scene of the incident and that Donzo himself was never present at the incident.

41. That during the course of the investigation NYPD did not properly conduct a line up and instead administered the line up in a manner outside NYPD customs and norms.

42. That the NYPD presented the 12 person photo-array as two separate 6 person photo-arrays where the alleged victim of the incident failed to establish Plaintiff's identity in the first photo-array.

43. That during the course of the investigation, Plaintiff's phone records were obtained and showed that Plaintiff and A. Donzo were in communication throughout the course of the incident, indicating that Donzo was somewhere other than at the location of the incident.

44. That the NYPD acted with racial animus, through Defendant Mullen, when the

department failed to further explore the material value of said phone records when Sprint documents confirmed phone and text based communications occurring throughout the course of the incident.

46. That during the early course of the investigation Donzo's alleged infraction was presented to the Queens County District Attorney's office for prosecution.

46. That The District Attorney declined to prosecute Donzo.

47. That, upon information and belief, the District Attorney declined to prosecute due to the lack of evidence to substantiate the claims against Donzo.

48. That nonetheless, Sergeant Mullens continued to pursue plaintiff due to race based bias displayed by Sergeant Mullen on behalf of NYPD.

49. That, upon information and belief, Sergeant Mullen has been known to target Black and Brown officers at a disparate rate compared to White officers accused of similar or even lesser offenses.

50. For example, one anonymous Black officer ("Anonymous 1") who is presently employed with the NYPD reported that Mullen was his vice-supervisor and described her as "racist." This officer recalled that Mullen would assign him to jobs only when White officers declined it or that she would assign him to jobs that White officers typically would not want to do [e.g. taking prisoners to Criminal Justice Bureau, watching hospitalized prisoner and being sent to detail]. Anonymous 1 further relates that Sgt. Mullen, as was her rank at the time, even treated White prisoners better than Black ones, allowing White prisoners to see their family when in detention or even be brought food and not allowing the same for Black prisoners. Many prisoners complained about Mullen and Anonymous 1 surmises that the complaints led to Mullen being assigned as an Integrity Control Officer ICO), off the streets and away from prisoners.

51. That Mullen's animus toward Anonymous 1 was motivated by racial animus and not as a result of any poor performance by Anonymous 1.

52. That another Black officer, Anonymous 2, avers that once he was assigned to work with Mullen and was quickly reassigned to work with someone else. Anonymous 2 learned that he was reassigned because Mulen said "I don't want that scumbag working with me." Anonymous 2 confronted Mullen about the incident and she had no response to his accusation.

53. Anonymous 2 adds that when Mullen was transferred to ICO she targeted Anonymous 2 even though she was not his direct supervisor. Mullen, would, for example, inspect Anonymous 2's memo books for fault in order to improperly discipline Anonymous 2.

54. Anonymous 2 believes that Mullen's actions against him were motivated by racial animus because she would sometimes cite him for command discipline for minor infractions for which she would not cite White officers for the same infraction.

55. Upon information and belief, Anonymous 2 is a current officer with the NYPD.

56. That anonymous 2's complaints are similar to those of Donzo's in that even though Mullen was not Anonymous 2's direct supervisor, she inspected his behavior as though she was and acted against Anonymous 2's interest not because of poor performance but due to a well-known racial animus against Black and Brown officers.

57. Anonymous 3, another Black officer and current employee with the NYPD, tells a similar tale to Anonymous 1 and 2 which includes calling Mullen one of the most racist and worst Supervisors with whom he has worked. Anonymous 3 recalls that Mullen would often times disapprove requests for days off for Black officers whereas she would hastily grant same to White officers. Anonymous 3 complained to his Lieutenant but to no avail.

58. Anonymous 3 complained that coming to work was stressful under Mullen and that

while he contemplated filing a complaint with the EEO he later abandoned the idea for fear of retaliation.

59. Anonymous 3 used the word "torture" to describe how Mullen treated Black officers, forcing him to apply to another unit in order to escape Mullen. Anonymous 3 eventually never transferred as it was Mullen herself that was then transferred to Organized Crime Control Bureau of Investigation (OCCBI). Anonymous 3 credits Mullen's transfer to OCCBI to the complaints by Black officers.

60. That the officers mentioned above are anonymous because they fear retaliation by the NYPD.

61. That we can glean from the stories of the three officers that Mullen's behavior was well-known to the NYPD.

62. That the NYPD permitted Mullen to remain on the force and continue acting upon her racial animus up until her retirement.

63. That by allowing Mullen to continue with the conduct, the NYPD, and therefore the Defendant City, adopted her behavior as a custom and policy.

64. That the investigation against Donzo itself contained several inconsistencies that demonstrate that Donzo was not present at the incident.

65. That in addition to what has already been described above the investigative report demonstrates that: (1) the investigative report states that the photo-array was conducted on March 2, 2015 yet the shop owner, Batalla, testified that he was shown the photo-array two weeks after the incident, (2) a department witness testified that the alleged culprit displayed a black badge yet the department does not issue black badges, (3) Mr. Batalla described the weapon displayed as a revolver yet the department does not issue revolvers to ranks of police officer, (4) during a post

investigation hearing, department witness Vidal testified that he recognized Donzo as the culprit because of Donzo's beard yet it is undisputed (the photo-array) that Donzo did not have a beard at the time of the incident and Batalla, Vidal's father, had also testified that the culprit did not have a beard.

66. That the hearing that followed the racially biased investigation was itself fundamentally unfair because the department serves both as the judge jury and executioner of Donzo' fate.

67. That similar to the investigation, the hearing that followed was wrought with incidents of unfair treatment.

68. That for example, when Martin Batalla misrepresented facts that were known to be untrue, Commissioner Wiesel did not intervene to clear up the matter showcasing NYPD acted negligently.

69. However, when the Plaintiff witness took the stand, Commissioner Wiesel engaged the witness in a hostile manner without reason.

70. That the commissioner Wiesel's aggressiveness with Donzo's witnesses did not occur with any other witness on the stand and the transcripts provide no rational reasoning for why the commissioner engaged in such a manner.

71. That Commissioner Wiesel, as an agent of the NYPD and administrative law judge should have known that the Department witness testimony was false, but failed to fairly administer impartiality during the course of the hearing.

72. That the NYPD failed to investigate or incorporate an abundance of evidence in the fair hearing leading to the hearing process being biased against plaintiff as a result of the race based discrimination deployed by the NYPD over the course of the investigation and fair hearing.

73. That the NYPD failed to fairly assess these testimonies during witness fair hearing and did not provide Plaintiff an actual fair hearing.

74. That but for Mullen's racial animus, the matter against Donzo would have otherwise never made it to a hearing. See, e.g. that the District Attorney declined to prosecute the matter against Donzo.

75. That the inconsistencies, errors and failures in the investigation only happened because Mullen was more motivated by eliminating "niggers like [Donzo]" from the force than by a true investigation into the underlying charges against Donzo.

76. That because only Mullen, and therefore the NYPD and the City of New York, held the power to complete a proper investigation, the failure to do can only be deemed an intentional deprivation of due process motivated and colored by racial animus is a failure in due process.

77. That to the extent that Mullen actively failed to investigate certain leads or evidences that may have exonerated Donzo makes for an unfair administrative proceeding where Donzo, himself has no investigative powers to rebut Mullen.

## AS FOR A FIRST CAUSE OF ACTION: 42 U.S.C. §1981

78. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

79. That Donzo's termination from the police department was without just cause.

80. That the racially disparate treatment of Donzo and other similarly situated persons constitutes a deprivation of the rights conferred on the plaintiff by the Civil Rights Act of 1964, 42 U.S.C. section 1981: "all persons within the jurisdiction of the United Stated shall have the same right in every State and territory to make and enforce contracts…and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white

citizens."

81. Defendants' actions had both the intention and effect of depriving plaintiff of the rights and benefits of his contractual relationship with the Department on the basis of his race color and national origin.

82. The actions of defendants in depriving plaintiff of their civil rights as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, plaintiff in entitled to compensatory damages in an amount to be determined at trial.

### AS FOR A SECOND CAUSE OF ACTION: 42 USC §1983

83. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

84. Through the events recited herein, the individual defendants, more specifically Mullen, while acting under the color of law, subjected the plaintiff to the deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States, and specifically the Equal Protection and Due Process guarantees of the 14th amendment and Civil Rights guaranteed under Article 1, section 11 of the New York State Constitution.

85. Plaintiff has been deprived of his Constitution of his Constitutional Rights to be free of discrimination based upon his race, national origin and opposition to discrimination and has been damaged and suffered emotional distress therefrom.

86. As a result of the aforesaid wrongful acts of Defendants, Plaintiff has been damaged in an amount to be determined at trial and is entitled to punitive and exemplary damages.

87. Plaintiff also seeks reinstatement of his employment.

### AS FOR A THIRD CAUSE OF ACTION: New York City Administrative Code §8-107(1) Et. Seq. (New York City Human Rights Law)

88. Plaintiff repeats and alleges each and every allegation contained in the above

paragraphs as though fully set forth herein.

89. Defendants' treatment of Plaintiff and his complaint herein based on race, national origin and opposition to discrimination, constitutes discrimination in violation of the New York Administrative Code §8-107(1) Et. Seq. and the New York City Human Rights Law.

90. The aforementioned occurrences were caused by the wrongful, careless, reckless and intentional acts of the Defendants.

91. Because of the foregoing, Plaintiff had been damaged in an amount to be determined at trial and for punitive and exemplary damages.

**AS FOR A FOURTH CAUSE OF ACTION: New York State Executive Law §296**

92. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

93. Based on the foregoing, the Defendants intentionally and willfully discriminated against the Plaintiff in his employment on account of his race, national origin, opposition to discriminatory practices, in violation of New York State Executive Law §296.

94. Plaintiff was victimized by the Defendants failure to promote plaintiff, termination of Plaintiff, and preference to non-Black employees in the same situation of worse.

95. Where non-Black employees were accused of similar or worse acts, White employees were treated, specifically by Mullen, with greater dignity and deference simply because they belong to a racial class of White.

96. Such conduct on the part of Defendants were without justification, violated Plaintiff's Civil Rights guaranteed under the New York State Executive Law §296 and the New York State Constitution.

97. Because of the foregoing, Plaintiff had been damaged in an amount to be

determined at trial and for punitive and exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment against the defendants as follows: (1) Declaring the aforementioned actions of Defendants unconstitutional and in violation of the New York State Constitution, the U.S. Constitution, New York State Executive Law §296, New York Administrative Code §8-107(1) Et. Seq and other applicable laws mentioned herein, (2) For an amount to be determined at trial on the First Cause of Action, (3) For an amount to be determined at trial on the Second Cause of Action, (4) For an amount to be determined at trial on the Third Cause of Action, (5) For an amount to be determined at trial on the Fourth Cause of Action, (6) For Punitive and Exemplary damages, (7) For all costs of this action including reasonable attorneys' fees incurred by Plaintiff, (9) For such and other relief as may be just

Dated: Brklyn, NY
05/18/21

                                          /S/
                          **MUSTAPHA NDANUSA, ESQ.**
                          **Davis Ndanusa Ikhlas & Saleem LLP**
                          Attorney for Plaintiff(s)
                          Office and P.O. Address
                          26 Court Street, Suite 603
                          Brooklyn, New York 11242
                          Tel.: (718) 825-7719
                          mndanusa@dnislaw.com